IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS PROJECT,   )
et al.,                              )        Civil No. 06-776-PA
                               )
         Plaintiffs,     )     **OPINION AND ORDER**
                               )
             v.            )
                               )
LINDA GOODMAN, et al.,      )
                               )
         Defendants,     )
                               )
AMERICAN FOREST RESOURCE    )
COUNCIL and SILVER CREEK     )
TIMBER COMPANY, INC.,       )
                               )
       Defendant-Intervenors.   )
_____)

**PANNER, Judge:**

    Plaintiffs Cascadia Wildlands Project, National Forest
Protection Alliance, Native Forest Network, Klamath Forest
Alliance, and Siskiyou Regional Education Project ("Plaintiffs")
bring this action against the United States Forest Service
("Forest Service") and two Forest Service officials sued in their
official capacities: Linda Goodman, Regional Forester for the

1 - OPINION AND ORDER

Pacific Northwest Region, and Scott Conroy, Supervisor of the Rogue River-Siskiyou National Forest (collectively, "Defendants").  The American Forest Resource Council and Silver Creek Timber Company were permitted to intervene as defendants.

The Complaint accuses Defendants of violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and its implementing regulations, 40 C.F.R. §§ 1500-1508, by not preparing a Supplemental Environmental Impact Statement ("SEIS") before proceeding with the planned Mike's Gulch and Blackberry timber sales in the Rogue River-Siskiyou National Forest ("RRSNF") in southwest Oregon.  Plaintiffs seek to permanently enjoin those sales pending completion of an SEIS.

Authority for the court to review the challenged agency action is conferred by Section 1 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

Before the court is Plaintiffs' motion seeking a preliminary injunction halting the challenged sales pending completion of this litigation.  I conclude that Plaintiffs have little chance of ultimately prevailing in this litigation, and are not entitled to a preliminary injunction.

### **Background**

The Mike's Gulch and Blackberry timber sales were authorized as part of the Biscuit Fire Recovery Project ("Biscuit Project").

The Biscuit Fire began in the Klamath Mountains on July 13, 2002, after a lightning storm swept through northwestern California and southwestern Oregon. (Biscuit Project Final

Environmental Impact Statement ("FEIS") I-1).  The fire was active for one hundred twenty days, and engulfed 499,965 acres. The fire was declared controlled on November 8, 2002.  (Id.). The affected area includes nearly entire 178,000 acre Kalmiopsis Wilderness Area; 164,923 acres in Late Successional Reserves ("LSRs");[1] 3,428 acres in Wild and Scenic River Corridors; and approximately 188,000 acres in Inventoried Roadless Areas ("IRAs").[2]  (Id. at I-1-2).

Following fire suppression activities, resource specialists analyzed impacts using aerial photography and field reconnaissance.  The Forest Service held ten public meetings to gather input from residents of affected communities concerning

---

[1]  The Northwest Forest Plan classifies lands into seven categories.  Lands designated as LSRs are "designed to serve as habitat for late-successional and old-growth related species including the northern spotted owl" and "are to be managed to protect and enhance old-growth forest conditions."  (Northwest Forest Plan Record of Decision ("NWFP ROD") at 6, 8).  Lands within formally-designated Wilderness, Wild & Scenic Rivers, National Parks, National Monuments, and similar land allocations are to be managed for the designated special purpose.  (NWFP ROD at 6).  "[F]ederal land within the range of the northern spotted owl" but not part of the six special categories is classified as "Matrix."  (NWFP ROD, Appx. A at C-39).  Most timber harvest that occurs in spotted owl habitat will take place on Matrix lands, but Matrix lands still must be managed to protect wildlife habitat values by, inter alia, maintaining "a renewable supply of large down logs well distributed across the matrix landscape" and complying with snag retention standards.  (Id. at C-39-47).

[2]  The Inventoried Roadless Area designation is an overlay zone applied to areas, meeting certain minimum acreage criteria, that show "little evidence of past management, including roads" but which have not formally been designated as wilderness.  Lands within the IRA overlay zone may also bear other designations, such as Matrix or LSR.  (Inventoried Roadless Area Record of Decision at R-2).

desired treatments and options.  On January 30, 2003, the Forest
Service published the Biscuit Post-Fire Assessment.  The Forest
Service identified three overriding objectives: to recover
economic value from burned timber, to reduce risk to nearby
communities and forest resources from future high intensity fire,
and to revegetate burned conifer stands and burned plant and
animal habitats.  (FEIS I-1-6).

A Notice of Intent to prepare an EIS and to assess land
management options after the Biscuit Fire was published in the
Federal Register on March 19, 2003.  The public comment period
for the Biscuit Fire Recovery Project Draft EIS extended from
November 22, 2003 through January 20, 2004.  (Id. at ES-5).

The Biscuit Fire Recovery Project FEIS was released on June
4, 2004.  The 30-day public review period ended July 6, 2004.  On
July 8, 2004, defendant Conroy issued three separate Records of
Decision ("RODs") regarding the Biscuit Project: the Inventoried
Roadless Areas ROD ("IRA ROD"), authorizing activities in IRAs;
the Late Successional Reserve ROD ("LSR ROD"), covering
activities within LSRs not within an IRA; and the "Matrix ROD,"
which covered activities within Matrix lands not within an IRA.
In addition, the Medford District of the Bureau of Land
Management ("BLM") issued the "BLM ROD," which applied to
activities on lands administered by the BLM. (IRA ROD at 1).

These four RODs implement Alternative 7 of the FEIS.  It
"was broken down into four RODs in recognition of legal
responsibilities and differing land management objectives."  (IRA

ROD at 1). _____

In the LSR ROD, the Forest Service was to select 6,305 acres of salvage harvest on LSR lands, create 52 miles of Priority 2 fuel management zones,[3] plant 12,700 acres of burned conifer stands and associated riparian reserves, seed 1,630 acres of meadows and savannas, reduce tree encroachment on 590 acres of meadow, maintain 200 miles of road, and build (and, subsequent to use, decommission) 1.3 miles of temporary roads. (LSR ROD at 2). Only trees without green needles or leaves were to be harvested (with the exception of trees "incidental to operations.") No logging was to occur within the Kalmiopsis *Wilderness* Area, as distinguished from the Kalmiopsis *Roadless* Areas. (FEIS II-35, 52-53).

_____In the IRA ROD, the Forest Service was to select 8,174 acres of salvage harvest on lands within IRAs, create 166 miles of Priority 3 & 4 FMZs, replant on 9,178 acres of burned conifer stands and associated riparian reserves, seed 4,770 acres of savannas, and maintain 59 miles of road. (IRA ROD at 2).

The two challenged timber sales - Mike's Gulch and Blackberry - are encompassed by the IRA ROD. The Mike's Gulch sale area, scheduled for immediate harvest, consists of approximately 961 acres in the South Kalmiopsis Roadless Area, of which 362 acres are to be harvested. (IRA ROD at 6). Portions

_____

[3] Fuel management zones ("FMZs"), also known as fire breaks, are strips of land from which most flammable material has been removed, creating zones of land that future wildfires may have difficulty traversing. (See FEIS II-2; Plaintiffs' Ex. 1, ¶ 7).

of the site are within a mile of the Illinois River, a National
Wild and Scenic River.  The winning bidder also will receive an
option to harvest salvage timber adjacent to the Hoover Gulch
Research Natural Area.

The Mike's Gulch sale was auctioned on June 9, 2006.  The
high bid was $32.05 per thousand board feet.  The Forest Service
has deferred awarding the contract until this court rules on the
pending motion for preliminary injunction.

The Blackberry sale, slated for auction in August 2006,
covers approximately 1,000 acres in the North Kalmiopsis Roadless
Area, of which 277 acres will be logged. (<u>Id.</u>).

A tabular compilation of relevant land areas affected by the
Biscuit Fire is included below.

### Biscuit Fire Recovery Area (BFRA)
### Land Area Metrics

| Affected land category | Area in acres | Acres proposed for salvage harvest under Alt 7 | % of affected land category proposed for salvage harvest | Acres currently scheduled for salvage harvest | % of affected land category currently schedule for salvage harvest |
|---|---|---|---|---|---|
| Total area burned in Biscuit fire | 499,965 | 18,939 | 3.8 % | 3,540 | 0.7 % |
| Area of Matrix land in BFRA | 26,000 | 4,460 | 17.1 % | 758 | 2.9 % |
| Area of LSR in BFRA | 164,923 | 6,305 | 3.8 % | 2,143 | 1.3 % |
| Area of IRA in BFRA | 188,246 | 8,306 | 4.3 % | 639 | 0.34 % |

| Salvage sale name | Acres to be harvested | % of burned IRA (188,246 ac.) |
|---|---|---|
| Mike's Gulch | 362 | 0.19 % |
| Blackberry | 277 | 0.15 % |

The Biscuit Project has been the subject of extensive litigation within this district.  Siskiyou Regional Educ. Project v. Goodman, CV 04-3058-CO and Wilderness Society v. Goodman, CV 04-3060-CO (consolidated), concerned the adequacy of the FEIS, whether the RODs violated the National Forest Management Act ("NFMA"), and the Forest Service's use of an "emergency situation determination" to prevent administrative appeals of six timber sales.  The district court ruled for the government.  An appeal is pending before the Ninth Circuit.  A motion panel of the Circuit recently declined to enjoin logging operations pending resolution of the appeal.  Siskiyou Regional Educ. Project v. Goodman, No. 06-35266 (9th Cir. June 7, 2006).  Cascadia Wildlands Project v. Conroy, CV 04-6440-TC, also challenged the RODS and FEIS, alleging violations of NEPA and NFMA.  The district court declined to grant a preliminary injunction, and the Ninth Circuit declined to disturb that decision.  No. 05-35389, 159 Fed. Appx. 769 (9th Cir. 2005).  The district court has since entered judgment for the government.  An appeal is pending.  Forest Service Employees for Environmental Ethics v. United States Forest Service, CV 04-3061-HO, concerned a peripheral issue of whether the specific trees to be cut may be marked only by Forest Service employees, or if they can be marked by employees of the logging company.  The Forest Service eventually modified the contract to alleviate the concerns raised by the plaintiff.  Klamath-Siskiyou Wildlands Center v. Medford District of the Bureau of Land Management, CV 04-3077-CO,

challenged a specific timber sale on BLM lands.  Finally, in
American Forest Resource Council v. Conroy, CV 04-6221-HO, an
industry logging group sought an increase in the quantity of
salvage logging, but later withdrew its claims.

The present action differs from the prior cases in that
Plaintiffs are not challenging the underlying RODs or FEIS.
Rather, Plaintiffs contend the Forest Service is required to
prepare an SEIS.  Nevertheless, as discussed later in this
opinion, there is some overlap between certain issues raised in
this case and those previously litigated.


Plaintiffs contend the following constitutes significant new
information necessitating preparation of an SEIS:

1.    The FEIS contains restrictions on wet-season and wet-
weather logging operations, but Plaintiffs allege that the Forest
Service has repeatedly waived those restrictions.

2.    Reports of at least two outbreaks of Phytophthora
lateralis, a fungus that kills Port Orford cedar, and can be
spread on mud clinging to vehicles, equipment, or boots.
Plaintiffs fear logging will spread that fungus to these roadless
areas.

3.    The alleged disparity between economic revenues
predicted in the FEIS and those actually generated by Biscuit
Project salvage logging sales.

4.    Some live trees allegedly were removed during Biscuit
Project salvage logging, despite the prohibition on this in the

ROD and FEIS.

5.    Logging occurred within the Babyfoot protected botanical area, which was not supposed to happen, and the Forest Service did not adequately guard against that occurrence.

6.    The alleged near total removal of trees and snags within areas of LSR, during Biscuit Fire salvage logging projects, even though the RODs and FEIS contemplated that the largest snags would be retained and that 50% of the smaller (9-21 inch) snags would remain standing after logging.

7.    Higher levels of natural regeneration were observed in the Biscuit Fire area than the levels projected by the FEIS.

8.    The Donato Report,[4] which studied post-fire conifer regeneration in the Biscuit Fire area and concluded that in the locations studied (a) the forest is regenerating successfully on its own, (b) post-fire salvage logging reduced natural seedling regeneration by 71% due to soil disturbance and physical burial during logging operations, and (c) post-fire logging may increase the danger of subsequent fires if large logs are removed while woody debris such as branches is left behind.

9.    The DellaSala Report[5] which asserts that (a) post-fire

---

[4] D. Donato, J. Fontaine, J. Campbell, W. Robinson, J. Kauffman, and B. Law, Post-Wildfire Logging Hinders Regeneration and Increases Fire Risk, first published in the Internet edition of SCIENCE (Jan. 5, 2006), available at http://www.sciencemag.org/cgi/content/abstract/311/5759/352 .

[5] D. DellaSala, G. Nagle, J. Karr, R. Fairbanks, D. Odion, J. Williams, C. Frissell & T. Ingalsbee, The Facts and Myths of Post-Fire Management: A Case Study of the Biscuit Fire, Southwest Oregon (2006), released by the Klamath-Siskiyou Program of the

logging and replanting is usually neither necessary nor beneficial, (b) the trees that remain, though dead, provide crucial shade, habitat, and nutrients for the forest's recovery, (c) slash burning after logging in the Biscuit Area has further damaged the soil, (d) the homogenous tree stands following replanting are even more susceptible to future fires, and (e) that the Forest Service actually loses money on every salvage logging sale.

10.  The first Nawa Report,[6] which asserts that salvage logging activities under the Biscuit Project have increased the fire danger by leaving unexpectedly large numbers of small, highly flammable dead trees lying on the ground in close proximity to each other, and that wildlife habitat value is being diminished by the removal of snags.

11.  The second Nawa Report,[7] which concludes that the Mike's Gulch and Blackberry sale areas are already regenerating on their own and that salvage logging and artificial replanting will actually delay recovery from the fire.

---

World Wildlife Fund.

[6] R. Nawa, <u>Decreased Snag Densities from Post-Wildfire Clearcut Logging in the Briggs Late Successional Reserve, Siskiyou National Forest, Oregon</u> (April 25, 2006), released by the Siskiyou Project.

[7] R. Nawa, <u>Natural Conifer Regeneration in Areas Burned at High Intensity by the Biscuit Fire</u>, (May 30, 2006), released by the Siskiyou Project.

12.  The Noss/Franklin Report,[8] which urges retention of large remaining trees after fires, rejects the notion that post-fire landscapes are "devastated and biologically impoverished," and argues that post-fire logging hinders the recovery process.

13.  The Strittholt Report,[9] which asserts that post-fire salvage logging hinders the recovery process and increases the fire danger.

14.  The Shatford Report,[10] which concludes that natural regeneration is adequate and that salvage logging will impair that process.

15.  A declaration by Richard Fairbanks, a former career Forest Service employee who served as Leader of the Interdisciplinary Team the Biscuit Project from January 2004 through April 15, 2005.  Fairbanks asserts that:

(a) Forest Service officials in Washington forced his Team to increase the salvage logging volume beyond what he believed scientifically sound, and that "incorrect data" and

---

[8]  R. Noss, J. Franklin, W. Baker, Ecological Science Relevant to Management Policies for Fire-prone Forests of the Western United States (Feb. 24, 2006), released by the Society for Conservation Biology, North American Section.

[9]  J. Strittholt and H. Rustigian, Ecological Issues Underlying Proposals to Conduct Salvage Logging in Areas Burned by the Biscuit Fire (January 2004), released by the Conservation Biology Institute.

[10]  J. Shatford and D. Hibbs, Predicting Post-Fire Regeneration Needs: Spatial and Temporal Variation in Natural Regeneration in Southwestern Oregon and Northern California (Dec. 2005), Annual Cooperative Forest Ecosystem Research, Oregon State University.

"inflated numbers" were used to support a pre-determined result.

(b) The Forest Service has failed to implement the FMZs described in the Biscuit Project FEIS and RODs, and has not funded the controlled burns contemplated in the Biscuit Project FEIS and RODs.

(c) The forest, including the Mike's Gulch site in particular, is regenerating naturally, and does not need artificial replanting.

16. The Mike's Gulch timber sale contract allegedly lets the purchaser remove only the lower eight feet of the trunk on some trees (a practice known as "butt logging"), while leaving the rest behind. These fine fuels, *i.e.,* brush and needles, and small and medium fuels, *i.e.,* branches and portions of trees, allegedly increase the danger from future wildfire, and necessitate more intensive slash burning.

Plaintiffs also offer other documents, such as the Rhodes Declaration, to further explain their contentions.

In response to submissions from the Plaintiffs and others, Defendant Conroy formed an interdisciplinary team led by Thomas Sensenig, Ph.D., an ecologist with the RRSNF, and Robert Shull, a wildlife biologist and NEPA planner. On April 11, 2006, the team issued a report (the "First Evaluation") which concluded that "none of the information" received by the Forest Service "was found to be new and relevant and significantly different from information presented in the Biscuit EIS." The team also concluded that there was no evidence "that the effects of the

Biscuit Project are significantly different from what was described in the Biscuit EIS."  (First Evaluation at 16).

Defendant Conroy adopted these findings and conclusions, stating that "[n]one of the items . . . turned out to be new, with the exception of new financial projections in DellaSalla et al.  This item of 'new information' did not pass the test of sufficiency because it was based on inappropriate variables and less accurate cost data than what was presented in the Biscuit [Project] EIS."  (Defendant's Exhibit M, ¶ 3).

A subsequent Forest Service Evaluation addressed the Second Nawa Report.  Nawa's report asserts that the forest will regenerate on its own even without salvage logging, that such logging has actually increased the fire danger, and that it will not generate the revenues that had been projected.

The Forest Service responded that Nawa and other critics have misunderstood the purpose of the salvage logging sales:

> Many documents, including [the Second Nawa] report, have been prepared by those opposed to post-fire salvage logging in the Biscuit Fire area that state, inaccurately, that a Purpose and Need in the Biscuit EIS calls for salvage logging as a prerequisite, either economically or ecologically, for successful reforestation.  That is not the case.  Neither the Biscuit EIS nor the Records of Decision state that salvage logging is needed to reforest areas burned by the Biscuit fire.
>
> One Purpose and Need in the Biscuit EIS was for economic recovery of the timber value at risk of loss from decay of fire-killed trees.  Salvage logging was proposed as the solution to meet that purpose to provide jobs in local economies.  That is the only

rationale given for salvage logging to meet the
Purposes and Needs identified in the Biscuit EIS
(Biscuit EIS pages I-8 and I-9).  The EIS does not
state that salvage logging is <u>needed as a solution</u> for
the Need to reforest areas burned by the Biscuit fire.

The Need to "revegetate burned conifer stands and other
burned plant and animal habitats" is included as
another, separate, Purpose and Need.  In the EIS
discussion of this Need, however, salvage logging was
not proposed, nor even discussed as a <u>solution</u> to meet
this Need.  (Biscuit EIS page I-9).  While it is true
that the EIS discusses how revenues generated from
salvage logging can be used to reforest those areas
logged, the EIS nowhere states that salvage logging is
necessary either ecologically or economically to meet
the need to reforest the areas considered under this
specific Purpose and Need.

(Defendants' Exhibit P, p. 3) (emphasis in original).

In short, the Forest Service concluded, most of the
criticisms aimed at the Biscuit Fire salvage logging sales were
off target.  The critics were arguing that the sales either would
not accomplish, or were not necessary to accomplish, objectives
that the sales were never designed to address, such as fire
suppression or forest regeneration.  The Forest Service again
found no basis for preparing an SEIS.

The Mike's Gulch sale was publicly noticed on June 2, 2006,
for auction on June 9, 2006.  (Plaintiffs' Motion for Temporary
Restraining Order, Ex. 16).  This action followed.

## <u>Legal Standards</u>

### A.    Preliminary Injunction

The purpose of a preliminary injunction is to preserve

rights pending resolution of the merits of the case.  Big Country Foods, Inc. v. Bd. of Educ., 868 F.2d 1085, 1087 (9th Cir. 1989).

To obtain a preliminary injunction, a party must demonstrate "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardship tips in its favor."  Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision, 738 F. Supp. 1564, 1566 (D. Or. 1990), citing Arcamuzi v. Continental Airlines Inc., 819 F.2d 935, 937 (9th Cir. 1987).  "These two formulations represent two points on a sliding scale on which the required degree of irreparable harm increases as the probability of success decreases."  Id.

"Serious questions are those sufficiently substantial to warrant further consideration by the court and to present fair ground for success."  Konecranes, Inc. v. Sinclair, 340 F. Supp. 2d 1126, 1129 (D. Or. 2004), citing Gilder v. PGA Tour, Inc., 936 F.2d 417, 422 (9th Cir. 1991).  "If the plaintiff shows no chance of success on the merits, the injunction should not issue."  Far West Federal, 738 F. Supp. at 1566.  See also Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978) ("No chance of success at all, however, will not suffice").

In balancing the hardships, the court must also consider the public interest when applicable.  Konecranes, 340 F. Supp. 2d at 1129, citing American Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir. 1983).

**B.    Review of Agency's Decision Not to Prepare an SEIS**

A federal agency must prepare an SEIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).

In deciding whether to supplement an EIS, the agency "should apply a 'rule of reason[.]'"  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373 (1989).  An "agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  Id. (footnote omitted).  "On the other hand . . . NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval."  Id.

"Application of the 'rule of reason' thus turns on the value of the new information to the still pending decisionmaking process."  Id.  "If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent *not already considered*, a supplemental EIS must be prepared."  Id. (emphasis added, footnote and citations omitted).

An agency's decision not to prepare an SEIS must be affirmed unless that decision was "arbitrary or capricious."  Id. at 377.

Review under this standard is narrow and the reviewing court may not substitute its judgment for that of the agency. See League of Wilderness Defenders--Blue Mountain Biodiversity Project v. Bosworth, 383 F. Supp. 2d 1285, 1292 (D. Or. 2005).

In deciding whether an agency decision was arbitrary or capricious, the reviewing court must evaluate whether the agency has considered all of the relevant factors, or has entirely failed to consider an important aspect of the problem or relied on factors that Congress has not intended the agency to consider. Id. at 1292-93. The reviewing court must also evaluate whether the agency has articulated a rational connection between the facts found, the governing law, and the conclusions reached, or if the agency has offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise. Id.

"Thus, the inquiry, though narrow, must be searching and careful." Id. at 1293, citing Ninilchik Traditional Council v. United States, 227 F.3d 1186, 1194 (9th Cir. 2000).

## Discussion

Plaintiffs contend that Defendants must prepare an SEIS to analyze what Plaintiffs characterize as significant new circumstances and information. Plaintiffs further contend that, without immediate injunctive relief, they will suffer irreparable injury. The contract for the Mike's Gulch sale is about to be awarded, the Blackberry sale will follow shortly afterwards, and

ground disturbing activities will immediately follow each sale. Plaintiffs also point out that the companies that bid on the Mike's Gulch sale did so with knowledge of the pending action including the request for injunctive relief.

**Preliminary Matters**

Defendants raise several preliminary matters.

### A.    Major Federal Action

Defendants argue that the SEIS regulations are not applicable to the Mike's Gulch and Blackberry sales because supplementation of an EIS is required only "if there remains major federal action to occur." Norton v. Southern Utah Wilderness Alliance (SUWA), 542 U.S. 55, 73 (2004).  Defendants correctly state the law, but not its application to the present facts.

Defendant's reliance on SUWA and Cold Mountain v. Garber, 375 F.3d 884, 894 (9th Cir. 2004), is not well taken.  In Cold Mountain, the Forest Service issued a ten-year permit to a state agency that sought to operate a bison capture facility.  The Complaint seeking an SEIS was not commenced until two years later.  By then, the only federal action (issuance of the permit) had long since been completed.  Id. at 894.

Here, the disputed timber sale contracts have yet to be awarded by the Forest Service, and this court has been asked to enjoin that award.  Without those contracts, logging cannot proceed.  Clearly "major federal action" remains.

/ / / /

18 - OPINION AND ORDER

SUWA is not on point either.  In SUWA, the BLM approved a land use plan.  Later, an action was brought to compel the BLM to prepare an SEIS, citing an increase in offroad vehicle usage. The Court held that supplementation was not necessary, because the only federal action at issue was completed when the land use plan was approved.  Id. at 73.  The Court emphasized that the land use plan was "generally a statement of priorities" that "guides and constrains actions" but does not ordinarily "prescribe them," id. at 71, and which document is "normally not used to make site-specific implementation decisions."  Id. at 70. Rather, any specific project would be the subject of a more focused process.

SUWA contrasted that general planning document to the partly-completed dam in Marsh, 490 U.S. 360, which was subject to the SEIS regulation.  "In Marsh, that condition [--that there remains major Federal action to occur--] was met: the dam construction project that gave rise to environmental review was not yet completed."  SUWA, 542 U.S. at 73.

The challenged timber sales at issue here fall on the Marsh side of the line.  The RODs are not a mere general planning document that was complete when the plan was finalized, but authorize site-specific projects that have yet to be consummated.

B.    **Extra-Record Evidence**

Defendants initially challenged the admissibility of certain documents offered by Plaintiffs, asserting that these are extra-record.  However, at the preliminary injunction hearing, all

19 - OPINION AND ORDER

parties stipulated that, at least for purposes of this motion, those documents could be considered.

**C.    <u>Exhaustion of Administrative Remedies</u>**

Defendants argue that the court cannot consider any documents proffered by Plaintiffs that were not first submitted to the agency.  Those documents include the First Nawa Report, the Strittholt Report, the Shatford Report, the Fairbanks Declaration, and the assertions regarding "butt logging."

Given the very expedited schedule for considering the motion for injunctive relief, this issue was not adequately briefed by all parties.  In addition, the arguments raised by those documents do not differ greatly from the arguments that Defendants have already addressed in the two Evaluations. Defendants have also countered the disputed documents with their own declarations and exhibits.  Finally, the parties stipulated to the use of extra-record documents.

In deciding the motion for preliminary injunction, I will consider all documents, while reserving the exhaustion of remedies issue for determination if later proceedings warrant.

**D.    <u>Issue and Claim Preclusion</u>**

Defendants' preclusion arguments are not well taken. Plaintiffs are again seeking to halt timber harvesting in the Biscuit Fire Project Area--an issue that has previously been the subject of much litigation in this district.  However, the issue in the present action is whether the Forest Service must undertake additional environmental review in light of alleged new

information or circumstances.  Plaintiffs contend that an SEIS must be prepared to address significant new information that emerged only after the RODs and FEIS were released.  By definition, such contentions (both legal and factual) could not properly have been raised in the various prior actions that challenged the RODs and FEIS, which were limited to the record before the agency when it issued the RODs and FEIS.  Consequently, such a claim could not have been litigated in the earlier actions and is not precluded.

To the extent that Plaintiffs allegedly are rehashing matters already decided adversely to them in the earlier cases, without citing significant new evidence, then their claim will fail on the merits, a showing of significant new evidence being the *sine qua non* of this action.  Consequently, it is not necessary to sort through the difficult questions that might arise in trying to invoke preclusion, especially when not all of the present plaintiffs were parties to the earlier cases that Defendants cite as preclusive.

Although the decisions in those other cases are not preclusive here, this court will nevertheless consider those other decisions in evaluating the likelihood of Plaintiffs succeeding on the merits in the present action.

**Whether Plaintiffs are Entitled to a Preliminary Injunction**

**A.    Likelihood of Success on the Merits**

Nearly lost amidst the stacks of briefing materials, and in the media spotlight this case has attracted, is a simple fact.

The Mike's Gulch and Blackberry salvage logging sales, together, will harvest a mere 639 acres, barely more than one-one thousandth of the total acreage burned by the Biscuit Fire, and less than one percent of the Inventoried Roadless Area acreage burned in that fire.

Plaintiffs contend these two sales have special significance because they are the first parcels to be logged within an Inventoried Roadless Area since the "Roadless Rule," 36 C.F.R. §§ 294.10 - 294.14 (2001), was enacted by the outgoing Clinton administration, and then replaced by a much different rule under the present administration. See Wyoming v. United States Dep't of Agriculture, 414 F.3d 1207, 1210-11 (10th Cir. 2005) (recounting history).

The matter before me, however, concerns only two small sales: Mike's Gulch and Blackberry. Whether logging should be permitted in some other location, or within IRAs in general, is beyond the scope of this litigation.

Once the proper scope of this case is clarified, it becomes a relatively easy case to decide. The Forest Service reviewed Plaintiffs' submissions, and responded with two very detailed evaluations. Those evaluations thoroughly address the issues that Plaintiffs raise, point-by-point, and provide a reasoned explanation why the information submitted by Plaintiffs does not warrant preparation of a supplemental EIS.

I have seen nothing that suggests this determination was arbitrary and capricious, or that the Forest Service made a clear

error of judgment.

Given the current stage of the proceedings, a motion for preliminary injunctive relief, I express only a tentative opinion here and reserve a final judgment until the appropriate time. Nevertheless, the Forest Service appears to have taken the legally-required "hard look" at Plaintiffs' submissions and made a reasoned decision that is amply supported by the Biscuit Project FEIS and the record.

Most of the evidence and arguments offered by Plaintiffs are not really new, even if the particular document containing the argument is newly created. Rather, Plaintiffs continue to differ with the Forest Service on whether the forest should be allowed to regenerate naturally, or should be artificially replanted. Plaintiffs also oppose salvage logging, believing the forest is better served if the burned trees remain and the burned forest is not further disturbed. Each side in this debate can point to competent scientists who endorse its respective viewpoint. Ultimately, that issue amounts to a choice among competing visions and priorities for the national forests. These issues were decided, at least for purposes of the Biscuit Project, when the RODS and FEIS were issued. The legal challenges to those documents have since been rejected. Now is not the time to re-argue those matters.

Some of Plaintiffs' contentions, such as the failure to retain the requisite number and quality of snags, or to create FMZs and undertake prescribed burns, also appear to be based on

an inaccurate interpretation of the Biscuit Project's FEIS and RODs, as the Forest Service pointed out in its Evaluations. Plaintiffs also appear to be mistaken in their contention that the sale contract authorizes "butt logging." The waiver of wet-season and wet-weather logging restrictions in some circumstances was already contemplated by the FEIS.

Furthermore, as the Forest Service noted in its Second Evaluation, many of Plaintiffs' arguments are aimed at establishing that salvage logging projects are not necessary because the forest is regenerating naturally, or that salvage logging does not decrease the fire danger, and does not generate profits for the Forest Service. Those arguments are beside the point. As the Forest Service made clear in its Second Evaluation, the primary purpose of salvage logging is "to provide jobs in local economies." (Defendants' Exhibit P, p. 3). Thus, it is irrelevant whether these salvage logging projects will fail to further some other goal.

Plaintiffs' materials raise the same issues already rejected by the Forest Service's Evaluations and do not present significant new information.

Based on the record before the court it appears that Plaintiffs have little chance of prevailing on the merits.

**Balance of Hardships**

"If the plaintiff shows no chance of success on the merits, the injunction should not issue," Far West Federal, 738 F. Supp. at 1566, and it is not necessary to balance the hardships between

24 - OPINION AND ORDER

the parties.  I am reluctant to say Plaintiffs have absolutely no
chance of success, but it is very slight.  To warrant issuance of
an injunction, then, the balance of hardships has to weigh very
strongly in Plaintiffs' favor.  It does not.

The only injury that Plaintiffs will sustain if the
injunction is denied is the logging of these 639 acres out of the
nearly half million acres burned in the Biscuit Fire.  I do not
view that injury as significant.  On the other hand, delaying
this project would work a serious hardship on Defendants.  Cf.
Siskiyou Regional Education Project v. Goodman, No. 06-35266
(Order denying temporary stay pending appeal, June 7, 2006) ("the
burned trees continue to lose economic value as their
deterioration rapidly progresses, which tips the balance of
irreparable harm in favor of the Appellees").

The lack of any real likelihood of success also negates the
need to consider the public interest in balancing the hardships.
Department of Parks and Recreation for the State of California v.
Bazaar del Mundo Inc., ___ F.3d ___, 2006 WL 1410076, *4
(9th Cir. May 24, 2006).  However, I note that the Forest Service
has articulated good reasons for undertaking these salvage
logging projects.  Salvage logging will yield income and benefit
loggers and others in the wood products industry, in a region of
Oregon where there often aren't many other good-paying jobs.  The
public interest is probably benefitted and, if damaged, it is
very slight.

### Conclusion

Plaintiff has not demonstrated any genuine chance of success on the merits.  Accordingly, Plaintiffs' motion for a preliminary injunction and temporary restraining order (docket # 3) is denied.  Plaintiffs' motion to waive the injunction bond (# 4) is denied as moot.

To allow the Ninth Circuit an opportunity to rule upon the inevitable emergency appeal, Defendants are enjoined from awarding the Mike's Gulch sale before 5:00 p.m. (PDT) on Monday, June 26, 2006.  This injunction automatically expires at that time unless extended by the Ninth Circuit.  No bond is required for this brief stay.

IT IS SO ORDERED.

DATED this 21st day of June, 2006.


/s/ Owen M. Panner
_____
Owen M. Panner
United States District Judge